Next we'll hear Evergreen v. NLRB. Counsel, please proceed. Would Petitioner's Counsel please approach the podium and proceed? Good afternoon. I'm Tom Grimm. I'm here on behalf of the petitioner, New Hope. This case is another in a long line of cases in which the Board has refused to follow the mandates of the Supreme Court and the Courts of Appeal. In essence, the Board has consistently done everything it can to take RN nurse supervisors out of the coverage of Section 211 of the Act and put them into collective bargaining units. And for that, it has been repeatedly and consistently criticized for not following the dictates of the NLRA. The case law holds that because the Board has exhibited a pattern of applying Section 211 as to supervisors inconsistently, the Court's review necessarily must be more probing. For that, I cite Beverly Enterprises, Minnesota v. NLRB and Integrated Health Services, Michigan. This particular case involves RN charge nurses in a nursing home setting, not a hospital. What charge nurse means? Yes, it means that the nurse is in charge of a wing or perhaps the entire facility. Now, Counsel, just going back to your citation to Beverly Enterprises, that's not a Ninth Circuit case. No. In fact, there are a lot of Beverly cases that are not Ninth Circuit cases. Right. And so you're asking us to adopt that rationale. We in the Ninth Circuit have not adopted that particular position. No, but this Court has adopted the general idea that a supervisor is a person who is accountable for the actions of people below him or her. Well, the question I was raising was regarding the deference that's due to the determination of the NLRB. And you cited the Eighth Circuit case to say that we should give probing deference as opposed to, I guess, ordinary deference. I would also cite the Kentucky River case, Your Honor. Okay. Because in Kentucky River, the Court did exactly the same thing and said, it is impossible to avoid the conclusion that the Board's interpretation of independent judgment, that's the second of the three supervisor categories or standards, I should say, applied to nurses for the first time after the health care decision of 1994, has precisely the same object, and that is to read the phrase independent judgment out of Section 211 of the Act. Did the Kentucky River case specifically address the deference issue? No, Your Honor. I don't think it did. I think that it basically ignored what the Board had done and followed what happened in the Sixth Circuit. Do you need a novel approach in the Ninth Circuit on scope of review in this case? My reading of your brief was that you were saying the facts were egregious enough and the law under Kentucky River clear enough so that you don't need a more probing standard of review. Your Honor, I believe that's correct, and that is what we argued in our brief. Could I ask you about a slightly different issue? Do I understand right this is a nursing home? This is a nursing home case. Old people or very sick people are in there, and the doctor only sees them once a month. The nurses run their care on a day-to-day basis. That is correct, Your Honor. Actually, the nursing homes have changed over the last 10, 12 years to be much more intensive care than they were, say, 20 years ago, and that has to do with standards that came into effect in 1987 and 1990, what's known as OBRA. They are found at 42 U.S. Code section 483, excuse me, 1396R, and in the CFRs it's 42 CFR section 483 or part 483. There's a comprehensive requirement to attain and maintain the highest practicable physical, mental, and psychosocial well-being of these residents, and that's what these charge nurses are charged with doing and implementing the many standards that are constantly changing in the view of the state surveyors. These facilities are, and I'm going beyond the record, but in answer to the Court's question, they are regularly, at least once a year, reviewed by state surveyors. You're talking about something entirely unrelated to my question, actually. Sorry. Here's my focus. I'm thinking a nurse at the kind of hospital where doctors are running up and down the hall all the time, they're doing surgery, they're quite active in patient care on a moment-to-moment and day-to-day basis, the nurses might have a role different from nurses in a facility where a doctor only sees the patient once a month and the nurse sees the patient and makes decisions about medical care on a day-to-day basis, except when the nurse decides that a doctor needs to be called for some special circumstance. You're talking about a different thing entirely. What I'm trying to find out is whether the case can be distinguished, if a distinction is necessary, from a case of a hospital such as I described. It can. In the hospital setting, there are many layers of caregivers, starting from the administrator of the hospital down to the doctors to layers of nursing supervisors, and eventually you get down possibly even to RNs and LPNs, and then below them you'd have a few CNAs or Certified Nursing Assistants. In the nursing home, the nurses are it. You're correct. The doctor only comes in and is only required to come in once every 30 days. That's what I'm trying to find out. And so as a consequence... You can't fancy your name, the nursing home, and I wanted to make sure I understood it right. You are absolutely right, Your Honor. You do have nurses who are designated as supervisors of that hospital. You have, and in this case... There were two, I think. Yes, Your Honor. You have the director of nursing services or head nurse. No question she's a supervisor. And then you have the staff development coordinator. No question she's a supervisor. No, they were stipulated as supervisors. But they're not around. And the record here shows that those people... Well, how much of the time are they around? I mean, when I say they're not around, what do you mean? They're around for five days a week and for 40 hours a week. They're there during the day shift. Okay, well, and on call the rest of the time. Yeah, all the rest of the time there are the charge nurses that are under them. They've got med nurses under them. They've got certified nursing assistants. What I'm thinking of is our decision in Providence Hospital where we say, Well, the fact that the supervisor isn't there doesn't mean that somebody who's left there is necessarily then a supervisor. In the nursing home setting, very different. And in fact... Well, that Providence Hospital was a nursing facility. In this circumstance, Your Honor, these people are making decisions. The record here says that when somebody... And we know that Director of Nursing Services is on call, or DON, Director of Nursing, as she's called the record. However, if she's called at all, it's for informational, because the charge nurse has made the decision and carried out what needed to be done. And here, FYI, as the record says, this is what happened. If somebody needs to be disciplined, FYI, I did it. Very different situation from what we had in Providence. And in Providence, this court held that the accountability is the ultimate determinant of a supervisor's status. What was the evidence on charge nurses being instances where they were held accountable for the CNA's work? Several cases have held that where they are accountable, that is, that they can be disciplined. I mean, what was the evidence that was offered here? It was said, and I think I have it here. In the July 16, 2001 hearing, Your Honor, there are several references at the beginning of it to what the charge nurses were doing in a supervisory way. For instance, on page 13, is that they are the only persons in charge for 14 to 16 hours a day. They're making the decisions. The calls are FYI, as I just referred. They do talk about personnel. What kind of decisions are they talking about there? Are they talking about care decisions, or are they talking about supervisory decisions? I mean, if a nurse decides that this patient needs something, that doesn't make her a supervisor. She has to be effectuating it through subordinates, basically. Actually, the exercise of professional judgment, as was stated in the Kentucky River case, can be the exercise of independent judgment within the scope of the act. But they still have to be supervising. Well, that's one of the hallmarks of being a supervisor, is the exercise of that independent judgment. It's one of the requisites of being a supervisor. It's one of the requisites, one of the three, under Section 211. That's correct. And we know now that the independent judgment can be medical judgment. That's correct. But I guess what we still have to establish is that, if I read our case in Providence correctly, is that the charge nurse is something more than a lead person or a straw boss. It has to be somebody who's got a little more elevation above the other employees and a little more accountability for their performance. Right. She can be disciplined. She's accountable for it. Okay. Now, what evidence was there that this had happened in this case? The question to Ms. White, who was the DON, was, do the floor supervisors have the same authority as charge nurses? Yes. Can a floor supervisor be disciplined for failing to ensure that a CNA does the task delegated? Answer, yes. What's the page number? That's page 15 of that same transcript, Your Honor. So you're saying that the person you're calling a supervisor can get in trouble if her subordinate does not do certain things? Yes, they can. She can get in trouble, and she does give verbal warnings to those people to keep them in line. What kind of things is she telling the subordinate to do? She's giving them a lot of different directions, Your Honor. And the record shows, page 50 of that, the witness is asked by Hearing Officer Luner, you said that a charge nurse can independently issue a verbal warning. The witness, verbal counseling, yes, verbal counseling. Hearing Officer Luner, when that occurs, is there any memo that is written to him that memorializes this occurrence? That's at her discretion. If she feels that she wants to take that step first, that's up to her. I understood that to mean if her subordinate doesn't do what she's told, the charge nurse can say, you're not doing what you're supposed to do here, you're not doing the job right. I think it's more of that. Whether she sends a memo is up to her. I'm still kind of curious as to what the job is. It's up to her to write her up in a verbal warning memorandum. That's how it's done. I thought verbal was just being misused to mean oral here. No, it's not. There's a memorandum of the oral warning or verbal warning, and then there's also a written warning, which is the next step in the progressive discipline, and then eventually there's either suspension or termination. And the charge nurse gets in trouble if, on her shift, the lower-down people aren't making the beds and cleaning up the place? Yeah, if they're not making the beds and meeting those needs of those residents, and they have to all be met. Incidentally, on the Providence, Washington case, I had understood the court to be saying that it was not a nursing home, it was an acute care hospital. That was my understanding of that, Your Honor. Providence Medical Center is the big hospital in Anchorage. I know. I'm from Fairfax. And so as a consequence, I think that's what they were talking about with the many layers of supervision. So it's possible that if you have lots of layers and somebody else is in charge, then these nurses that are lower down can just be doing menial tasks. That's not what we've got here. We have people that have to use that discretion. But in a hospital, the nurse may just be doing what the doctor tells her to do and not really supervising anybody. But in a nursing home where there are no doctors around, she's much more dominant in the hierarchy is what you're saying. I am saying that, and I'm also saying that patients or residents' care needs change and can change daily. And she has to make a decision about what to do right now, whether or not there's a care plan that addresses this issue. Counsel, does the record reflect whether or not the director of nursing or someone of a similar level is on call at all times for the RNs to consult? The record does reflect, Your Honor, that there is a director of nurses on call, meaning that she's not in the building. Right. And so if a charge nurse had an issue arise that was not covered by the manual or was beyond her scope of supervision, would she call the director of nursing to consult? The record reflects, as I said, that it's a four-year information. She makes a decision. She lets the director of nursing know if something happens in the building. So it's your position that the charge nurses are not required to and do not consult the director of nursing before making decisions as to patient care? No, Your Honor. They have to make the decision then and there as to what needs to be done. When I asked about evidence of a charge nurse being held responsible for failure of performance by a CNA, you quoted testimony of someone saying they can be. They can be. But were there any instances where they were? There was one piece of testimony, I believe, on cross-examination, Your Honor, that Ms. White stated that it had happened, but she couldn't remember the circumstances of it. Your Honor, I would like to reserve some time for rebuttal as well. Thank you, counsel. There are NMAR briefs. We have laid out in much detail the various jobs that these RNs do, both in directing and in disciplining and assigning to work, responsibly directing those individuals. I'm not going to repeat them all here, Your Honor, but they are extensive. Don't have any rebuttal time if you do. I think that's exactly right. We'll read the brief. What I will say, though, is that the board has come up short in most of the recent cases involving RN nurses. There's quite a string of them. The Beverly cases, Caremore, Glenmark, Integrated Health Services, Schnur-Macher, and, of course, the two Supreme Court cases, Health Care and Retirement Corp. and Kentucky River. So I think that in line with what the Providence case and the principle that was enunciated there, that where that person is ultimately responsible for nursing care in her unit, and that's a citation in Providence to the Beverly California Corp. case, that, in fact, this is exactly what we have here. These people are ultimately responsible, and I submit to the Court that there is the requisite independent judgment being exercised by these individuals to be supervisors. The board's order should be denied. May it please the Court. My name is Jeffrey Hirsch, and I represent the National Labor Relations Board, and I'll be ceding seven minutes of my time to Mr. Becker, Counsel for Intervenor. It's important to note at the outset here the central issue. I just don't see it. Let me tell you why so you can educate me if I'm wrong. To me, the Providence Hospital case out of Anchorage is easily distinguishable because it's a hospital. A person may have the same professional qualifications and be a supervisor in a nursing home, but not a supervisor in a hospital. In a hospital, there are doctors around 24 hours a day. In a nursing home, you've got a doctor once a month. It seems so obvious to me that with a doctor coming only once a month, somebody has to be running the place. It looks from the way it was staffed, so they're saving money on R.N.s. by using a whole lot of less professionally qualified people and using the R.N.s. mainly to tell other people what to do. Except for the NLRB's losing battle against the Supreme Court and a lot of other circuits, I just don't see what you've got here to make them nonsupervisors. Hypothetically, that may be the case, Your Honor, but in spite of the conclusory statements that Evergreen has put forth, there's no evidence in the record. What was your problem? To put in some evidence, you said that the manual showed that everything they did was just by rote. And my first thought was, gosh, I operate by manuals even more extensive than theirs. I've got the U.S. Code taking a whole wall in my office, all the rules of criminal and appellate and civil procedure and all these others. I'm following all these intricate manuals more than the nurses are. And then I told my law clerk, give me the material from the record that shows all these things in the manual that tells these people what to do. And he gave me the little bit that was in the record, and all it was was broad directives to exercise judgment. If there's something else in the manuals, it was your burden to put it in, and you didn't. No. With all due respect, Your Honor, it was not. First of all, it was the union that presented it, I believe. Secondly, it's the company's burden. And that's the key issue here. It is the company's burden to prove that its nurses are supervisors under the Act. It's your burden, if you're saying the manual shows that they're not, to show us the manual. I understand that, Your Honor. And let me be clear here. It wasn't necessarily we're going to lose or, you know, the nurses are not supervisors unless this manual shows it. It was only a union's attempt to rebut the company's showing that, you know, the nurses have supervisory authority by assigning CNAs to, you know, move somebody with, you know, not move somebody with only one CNA. Don't I get to be practical here in looking at this? I mean, a nursing home with just a couple of RNs around and everybody else is less professionally qualified and there are no doctors around? Perhaps, but it's really unclear. I mean, I don't know, you know, to what degree. It's unclear on the record how often the doctors are here. I thought it was clear as a bell, once a month, except when a nurse decided that a doctor needed to be called on a special basis. That's true, Your Honor. I apologize. Why did you say something different? I don't get it. Well, as the D.C. Circuit found in or concluded in the February. The D.C. Circuit couldn't have possibly been talking about how often the doctors come to Evergreen. Well, of course, the question is how often were the supervisors there? And there are two supervisors that we've been told are there 40 hours a week. Absolutely. And as this, I realize, I'm sure you're going to charge me for citing Providence again, but as this court even stated, in that case, the supervisors weren't there for, you know, was it two-thirds of the time? And this court held that that was not dispositive. And it's true here. Counsel, what's your response to opposing counsel's representation that the charge nurses reported to the supervisor, the director of nursing, only on an FYI basis and not for purposes of consultation? I'm sorry, Your Honor. I don't believe that's supported by the record. I mean, again, it's a bit unclear exactly what's going on because of the dearth of evidence here. But, I mean, there is no evidence showing that, in fact, they're only doing it on an FYI basis. Rather, there's evidence stating that, you know, or what evidence there is shows that if they want to discipline somebody, they have to get approval from the. Okay. Can we get to the issue if they want to provide patient care and an issue arises and the charge nurse makes a decision, what's the evidence in the record that that decision has to be made in consultation with and or with the approval of the director of nursing? I mean, I believe that they have to get it, they have to send it up to the chain of command to get approval. What's the evidence in the record? There was testimony, I believe, that stated that if they felt that there was a change in the patient's, in whatever the patient needed, that they were to report it up to the chain of command and then it would be decided by either the DSD or the DON in consultation, obviously, with the nurse to determine whether that patient care plan should be changed, but that the nurse did not have authority to do it on her own. Let me ask you this. Say there is an emergency, a patient stops breathing. So you're saying the charge nurse would have to call the director of nursing to determine what to do if a patient stops breathing if it's not in the manual. No, obviously that's not the case. They wouldn't have to do that. And in fact, I mean, but that's not something that requires necessarily independent judgment that's, you know, I mean, who are they supervising then? It's obvious what they have to do. How is it obvious? There are many reasons why a patient would stop breathing. Well, but there's, you know, I'm not going to, I'm certainly no doctor, so I'm not going to tell you exactly what's going on, but, you know, through their training, I mean, they're the nurse. They're going to determine what they need to do based on that. But what's important here is when they're doing that, are they exercising independent judgment in directing the CNA, or is it that there's certain things that they're supposed to do in that situation? That's why I was asking you where is it defined in the record as to the extent to which they act independently and the extent to which they have to consult the director of nursing. And I think that's, I'm unclear as to where that line is drawn in terms of the charge nurses. It is a bit unclear, and that's the problem in this case, is because the evidence isn't there as to exactly what's going on, and because it's their burden, that's why the board really had no choice here. You know, it's just. It looks like if all the nurses at the level in dispute are pro-union. I'm sorry? If all the nurses in dispute are pro-union and choose not to testify, then the management can't categorize them as supervisors under your theory, because no reasonable inferences are allowed. I'm not sure if that's the case, Your Honor. I don't, I mean, they can be subpoenaed, and certainly, you know, and the board, I don't. I mean, if there was obviously evidence that something like that was going on, the board would take that into account, do a negative inference of that. But, you know, again, maybe it is the case in the hypothetical that, in fact, they exercise independent judgment in assigning, directing, disciplining these nurses, but it's just simply not in the record, and that's what the board's left with. They had two opportunities to present evidence here, and they simply didn't do it. Rather, they're asking for yet another bite at the apple. What about this material in the excerpts? I think it's page 30 of 41 at the bottom, and it's page 61 at the top. Is that which? I'm sorry, which tab, Your Honor? It's tab D. D, yes. Yeah, they're not base stamped, so it's sort of hard to find. Yeah, no, I understand. And I'm sorry, if you don't mind repeating the page one more time. It says 61 at the top and 30 of 41 at the bottom. 30 to 41? 30. It says page 30 of 41 at the bottom. Okay, I have it, Your Honor. Why isn't that sufficient evidence? It's not showing what sort of supervisory authority that the nurse has. Rather, it's showing that the nurse has responsibility to care for the patient. That's not supervisory authority. As the record showed, they're essentially attached to the medical cart for most of their time. That's not supervising certified nursing assistants. I just don't, you know, I mean, much like the testimony regarding the manual that was parts that were put in there, you know, there was testimony showing that, you know, what the manual shows is, you know, if you have a problem, I believe the example was if there was a problem with the catheter. What about going on in that same section, pages 35 through 38 or so, where she says she tells the CNAs what to do and disciplines them when they don't do it? Right. And what the board is doing here is exactly what the Supreme Court in Kentucky River said it should do, which is looking to the degree to which they're, in this case, say, assigning or directing the certified nursing assistants. And here it's very, very routine matters. And it's up to the board in the first instance to determine whether the degree to which they're doing that equals supervisory authority in their act. And here it simply didn't do it. I mean, it's, you know, there's testimony that nurses do that to each other or CNAs tell the same sort of things to each other. I mean, people at work, obviously, you know, more experienced people will tell less experienced people how to do things. It seems like your theory would limit supervisors to the very top people, like the president and the executive vice president and everybody else, since they have to report to them or get things signed off by them or ultimately be subject to their authority, would not be a supervisor. No, I mean, I have to disagree, Your Honor. I mean, there's obviously a line and there's extremes. And, you know, there's admittedly gray areas here. But based on this record here, there's just, you know, were they actually responsible for, you know, and disciplined for what CNAs did or did not do? You know, if they were actually evaluating the nursing assistants, which they were not doing, the director of nursing did that. You know, if they were actually setting out their nursing assistants' schedules, if they were making assignments on their own about what the nursing assistants should do, then perhaps they would be supervisors. But they did none of that here, or at least there's no evidence that they did any of that here. So it's not – it's obviously not limited to the very top people. If there's nothing further, I'll cede the rest of my time to Mr. Becker. Thank you, counsel. Thank you very much. Thank you, Your Honors. Let me start by going directly to the question asked by Judge Kleinfeld. And I think we have to see that it actually cuts in exactly the opposite direction. The fact that there are no doctors present, and most of the times in this nursing home, means that the primary responsibility for providing care, professional care to these patients, is borne by these alleged supervisors. I thought there were very few of these alleged supervisors, and that most of the people providing the care were the certified nursing assistants and others who are further down the hierarchy than the RNs. Those individuals can't provide professional care. They can't deliver medications, for example. Can't they do it under supervision? No, they can't deliver medications, Your Honor. These nurses, as the testimony shows, are, in the words of the director of nursing herself, and I quote, attached to a MedCard. In other words, what they do almost exclusively – Can't deliver medication? Once every four hours? She can't tell the CNA to bring in the little tablets? No, Your Honor. That's not the way it works. What the testimony shows is that the dispensing of medications and provision of professional care in that regard is done by these nurses, that the care provided by the lower-level staff is not that professional medical care, not the dispensing of medications. So what these individuals do, undisputedly, almost exclusively, is hands-on nursing care. They're caring for the patients because the doctors are not there. They're doing the paperwork. Where should we look in the record to find this? Well, I'll quote to you. I don't have the page, and I'm sorry, but a couple things. The director of nursing testifies, and it's quoted in our brief, that they are, quote, attached to a MedCard. Could you give me a record or an excerpt site? I'll give you an excerpt site from the excerpt of the record, D-10. She's asked about her own experience. Did you say E-10? D-10. D-10. She's asked about her own experience when she was a CHARS nurse, and she's asked how often she would have to correct, direct a CNA, and she answers, and I quote, a couple times a week. A couple times a week. So what they're doing most of the time, indisputably, is caring for the patients themselves because there are no doctors there. Occasionally. That doesn't say that. All it says is that she only had to verbally correct CNAs a couple of times a week. That's correct. And that would be consistent with the CNAs most of the time doing what they're told. Doing what they know to do themselves. It doesn't say I only give directions to CNAs a couple of times a week. She says I only verbally correct CNAs a couple of times a week. Well, Your Honor, there is an ambiguity in the language. I don't see any ambiguity whatsoever. Well, let's look at what the evidence says. One is talking about giving people instructions, and the other is telling people they messed up. I don't see anything ambiguous. Let's look at what the evidence says. There's 60 pages there in the excerpts of the record, and the employer invites you to serve as a fact finder and look at that evidence, and I ask you to do it because if you look at the actual evidence on direction, what does it consist of? I'll give you a couple examples. I'm asking for the best on your side. Do you understand? I'd like you to look at all of them. I'll give you what I think are the best. If you look at the supplemental excerpts of the records presented by the board at page 13, there's an example from the RN who testified, and there was an RN who testified, presented by the union. So there's both the DON and one of the RNs testifying. She talks about lifting a patient. She's asked about examples of the kind of direction they give, and she says, and I quote, I'll just remind them, two people for Hoyer lifting. Question, and is it pursuant to the employer's policy on Hoyer's? Answer, yes, our safety protocol. So that's the kind of direction. She's providing patient care. She sees a CNA not properly using the lift to get a patient out of bed. She knows that's against the written policy, and she simply says to them you should be using two people. That's the kind of direction we're talking about. It's occasional direction to adhere to policy. I'll give you another example from ER excerpts of the records, section D, page 37. Again, the RN witness is testifying, and she says, say they needed to clean someone's eye out. Are you now D37? D37. Say they needed to clean someone's eye out. Maybe they didn't do a good job, or I'd say, you know, you need to, actually it's just showing them a better technique. Question, are you getting it from the employer policy? Answer, answer, it would have to be. In other words, these nurses are on the floors assigned to patients dispensing professional care. If they see a couple times a week, in the words of the DON, someone doing something improper, not according to policy, here are two examples of the direction which the employer alleges. You're supposed to use two people to lift the person out of bed. That's according to the written safety protocol. You're supposed to use this technique to wash out the patient's eye. That's according to the written policy. This is not the kind of direction using independent judgment which Congress had in mind, and the board did exactly what the court told it to do in Kentucky River. It said, look at exactly the assignment and direction. Then look at the constraints on the independent judgment. Then impose the burden on the employer to prove the exercise of independent judgment within the constraints of the employer's policies, manuals, rules, what have you. You have to look at the precise evidence, because the precise evidence shows that what these nurses do, almost exclusively, is hands-on nursing care. They don't assign the aids to patients. When you give this example from page 37 of tab D, my thinking is the nurse says to the person who's actually cleaning the patient's eye out, you did a good job or you need to do it better than you did it. The proper technique is such and such. And you're saying, well, that's just the rote following of a manual. And I'm thinking it's no more rote following of a manual than when we reverse a case and send it to the district court because of a misapplication of the sentencing guidelines or something like that. Your Honor, I'm not denigrating. The employer suggests that we're denigrating the importance of this. I'm not denigrating the importance, the incredible importance of what they do. Well, it's not a matter of denigrating. It's a matter of whether they exercise independent judgment in the course of supervising other people. Absolutely, Your Honor. And I don't actually see why they don't. Three points about that. Three points about that. One, obviously, if they're only doing it very occasionally, it requires less judgment. That is, if all they were doing was directing other people just in quantity, that would require more judgment. But we know from the record that most of the time they're providing care themselves. Occasionally they're directing. And these are a couple of examples. Two, we know that there are policies which constrain that judgment. Unfortunately, and I would agree with you, they're not in the record. But we know that there are policies which constrain their judgment to some extent. Three, we know that it's then the burden on the employer to prove that in these occasional exercises of direction, very occasional, and these are the examples that are given, it's the burden on the employer to show that they exercise independent judgment even though there are constraints of policies. And here's the evidence. The evidence is that the witness says, this is an example of how I direct, and it's according to policy. The policy says you've got to have two people to operate a hoyer. So if I see only one person doing it, I say you've got to have two people. That is not independent judgment. How do we know that all the nurse is doing there is applying some rote standard from the manual when you didn't put the manual in evidence, and the little bit of the manual that we have is broad policy directives? Your Honor, I did not try the case, but even if I did, the burden was not on me. When I say you, I don't mean you personally. I mean your side. The Supreme Court held very clearly that the burden is on the employer, and if you look at the employer's evidence, with all due respect, it is full of conclusions. Do they direct? Yes. Do they assign? Yes. But if you look at that evidence and break it down, for example, assignment. No, you don't get my question. Let me explain it. I read an excerpt that you just pointed me to, and it says a nurse reprimands other people for not using two people to lift a hoyer, and I'm thinking, boy, she really is exercising a lot of independent judgment. I don't even know what a hoyer is. And she's saying not only that she knows what it is, but you need two people to lift it. And you're saying, oh, that is not an exercise of independent judgment because it's right in the manual. And I'm saying, show me. Where is the manual? And it's not in the record. I don't have to. She says it on page 13. She says it is according to our safety protocol. She says it's according to protocol. She's not saying I exercise my judgment and determine it might injure the patient or the worker. She's saying this is protocol. I simply told them to follow protocol. The employer could have put on rebuttal evidence and said, no, there are many instances where they exercise judgment in situations which are not governed by protocol or by policy or by the manual. The employer failed to do it. And the board reasonably found it failed to carry its burden as a result. You cannot look at any of the specifics, and you have to look at the specifics. That's what the employer is asking you to do. Actually go in and look at the evidence, and I invite you to. Look at the specific testimony about specific acts of direction, and if there is evidence that independent judgment was used in those instances of direction. And you find that the evidence does not exist. Counsel, before you conclude, on Exhibit D of the excerpts of record, page 40 to 41, this was the excerpt that you, I thought, had referred us to. Starting at line 13, 14, it talks about this nurse was saying, I supervised. I didn't work. I worked as a charge nurse yesterday. Did you work as a charge nurse on Saturday? Saturday I worked as what they call the RN supervisor. What does that language mean? Does that mean that a charge nurse is a supervisor, or? That language is very confusing. And what the testimony is that the RN supervisors, the testimony is that the rules require them to have one nurse on duty who is not, quote, attached to a med cart. So during the day, that role is fulfilled by the DON. She's an RN. She's licensed, and she's not attached to a med cart. But in the weekends and evenings, they need someone else, and so they have this person called the RN supervisor. But there's an explicit testimony about what she does, and I can't quote it exactly off the top of my head, but essentially she serves as an extra pair of eyes and ears for the other nurses. So she's a charge nurse sometimes, and RN supervisor at other times. The same person can serve both roles. Yes. And the testimony is that she essentially helps them. If they have their hands full, they might say to her, could you help me out with this patient? She's an extra pair. Even though she's a supervisor, even though it's called a supervisor, RN supervisor is just an extra pair of hands. That's exactly what the testimony is, Your Honor. All right. Thank you, counsel. Thank you. Well, that's not the testimony. On page 9 of our reply brief, we quote from the appellate Potter Pavlukovich, who was a charge nurse, who was also a unit nurse. Go forward and look in the excerpt. In the record. Actually, it's from ERD, the excerpt from record D, pages 30 to 31. He's asked about the nursing process, and can you tell me that? Can you describe that for me? Actually, she says, it's a scientific overview, and it's done with everything, where you assess the patient, you kind of look at things, then you make a plan, then you follow through, and then daily you check it out. And if it doesn't seem to fit the patient, then you change it and start all over again. Question, do you do this independently or do you do it with anyone else? Actually, you're taught it's independent. Independent judgment. It becomes ingrained in you as a nurse when you look at a patient. So this is something you learn in your training as a nurse? Mm-hmm. She says? See, I guess the question I would have is whether this is independent judgment in deciding what care the patient needs, which is one thing, but I don't think it's what the case is about. I think the question is whether there's independent judgment in supervising others. In directing the work of others, Your Honor. Okay. And that's to responsibly direct. That's the standard we're dealing with here. Right. So I don't know what any of that testimony has to do with that. Well, what that testimony is saying to us is that that nurse must use her professional, independent judgment to determine what's necessary on the floor at any given time and direct people to meet those needs. That's what's going on here. Is that latter language in there and direct people when she's describing it in there? She didn't say it in her testimony. I might add also this is a nurse, and she is not somebody who is steeped in LRB law. But that's what she's saying she's doing. She's describing the nursing process. Did somebody else say that the way she implements these plans is by directing other people to do the work? Well, she does, and it is throughout the record that she's directing the CNAs, Your Honor. That's throughout most of these pieces of the testimony in both hearings. And also that information on the four-year information, that's on page 13 of the July 16 hearing, where both as to employment decisions and operational decisions that the person has made on the floor, she lets the director of nurses know, but it's on a four-year information basis. That is the record. I submit in closing that I have it on page ‑‑ I'm sorry, I don't have the exhibit or the excerpt with me, but it is page 13 of the July 16, 2001 hearing. And I can quote that to you if you'd like. What kinds of things do they call you about? Hold on. Finding it is what I'd really like to have. It's exhibit D, page 7. Well, I think it's page 7 of the excerpt. 7 of the excerpt, yes, Your Honor. What kinds of things do they call you about? They call ‑‑ they may call it to be usually FYI. Say there's been a disturbance outside, there's a leak in the roof, things like that. They have a call and let us know what is going on. Are the calls primarily about operational issues, operational? Occasionally it's a FYI to let us know that a patient has changed condition, and those calls would come to me. Do they ever call you about personnel issues? FYI, yes. So the charge nurse makes a decision, carries it out, and then lets the DON know. That's it. Do they ever call you about personnel issues? That's what this was about. Do they ever call you about personnel issues? The answer is yes. It's an FYI basis. Personnel issues having to do with other RNs, personnel issues having to do with CNAs, personnel. I'm sorry, Your Honor. What kind of personnel decisions does it say? It goes on to say, so to let you know that something has happened, answer yes. Do they ever call to ask permission to take action against a CNA? Not permission. So they're just calling to inform you? Answer right. I submit to you that what's really going on here with the board is to try to create a hurdle over which no employer can jump in trying to establish the supervisors and to reduce, in this nursing area, supervisors down to next to nothing. As one board has said, to narrow the definition down to nothing. It's strange credulity that nurses are made out to be automatons, blindly following the rules for care and care plans, especially when they have these changing, fluid, dynamic situations in nursing homes that they have and they're responsible for. Thank you, Your Honor. Thank you, Counsel. Evergreen v. NLRB is submitted.
judges: Canby, Kleinfeld, Rawlinson